COMMONWEALTH of Pennsylvania, Appellee,

v.

**Steven W. MITCHELL, Appellant.**

Superior Court of Pennsylvania.

Submitted March 28, 2005.

Filed Sept. 12, 2005.

---

Lynn E. Ober, Leesport, for appellant.

Andrew J. Serina, Asst. District Atty., Pottsville, for Com., appellee.

BEFORE: LALLY–GREEN, PANELLA, and KELLY, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant, Steven W. Mitchell, appeals from the judgment of sentence imposed on December 29, 2003, following his conviction by jury of kidnapping, aggravated assault, and related offenses. The trial court imposed an aggregate prison term of five to ten years. We affirm.

¶ 2 The trial court described the factual background of the case as follows:

The evidence elicited at trial indicated that Defendant had been under the belief that the victim herein, Jason Moyer, had engaged in inappropriate sexual activity with Defendant's adult step-daughter (which conduct Moyer had denied—claiming such had been consensual). Defendant, who knew Moyer, contacted Moyer's mother-in-law's residence by telephone on August 11, 2002, demanding that Moyer come to Defendant's home to apologize to Defendant's step-daughter. Moyer, at first reluctant to go to Defendant's home, agreed to do so upon the insistence of his (Moyer's) mother-in-law.

After Defendant made two telephone calls in an attempt to contact Moyer, Defendant and Kevin Nester, Defendant's friend and co-conspirator herein, drove to Moyer's mother-in-law's home.

Upon arrival, Defendant found that Moyer was not there. Defendant and Nester left, but eventually found Moyer standing outside Clouser's mini-market near Auburn, Schuylkill County. Upon seeing Moyer, Defendant chased Moyer into the market, where Moyer ran behind a counter and asked the cashier for "help." Defendant followed Moyer, grabbed and struck Moyer, and took Moyer outside, where Defendant forced Moyer to pump gas into Nester's car. While doing so, Defendant smacked Moyer in the face, slammed Moyer's head into a car window, and held the gas hose handle over Moyer's head.

At some point, Moyer became able to free himself from Defendant's control and ran into an adjacent field. Defendant chased Moyer, but Moyer kept running, escaping into a nearby wooded area. Defendant returned to the mini-market, and removed spark plug wires from Moyer's vehicle, disabling the vehicle. After some time, believing Defendant had left the area, Moyer returned to and entered his vehicle, discovering, however, that it was inoperable. Defendant reappeared, grabbed Moyer, pulled him from the car and forced him into the back seat of Nester's car and closed the door, whereupon Nester, who was driving the car, left the mini-market parking lot. While in the car, Defendant struck Moyer multiple times in the back, shoulders, face and head.

According to Moyer, Nester drove to Defendant's residence, where Nester, Defendant and Moyer exited the vehicle. Defendant told Moyer to apologize to his step-daughter for the alleged sexual activity. Moyer did so, but maintained that the incident had occurred due to miscommunication. After a short period, Defendant again forced Moyer into the back seat of Nester's vehicle, made

Moyer put on a blindfold and place his head on Defendant's lap. While Nester drove, Defendant elbowed, punched and slapped Moyer multiple times for approximately fifteen to twenty minutes, during which Moyer cried, asking Defendant to stop hitting him, saying he (Moyer) wanted to go home.

Eventually, the car stopped. Defendant took the blindfold from Moyer's eyes and Defendant and Nester escorted Moyer through a wooded area, where Moyer was forced to remove his clothes and lie on the ground. Defendant and Nester then repeatedly hit Moyer with a club. During the incident, Defendant ordered Moyer to raise his legs, whereupon Nester hit Moyer in the testicles with the club, while, occasionally, Defendant stepped on Moyer's neck. Defendant also beat Moyer with the club, striking Moyer on the back and spine numerous times, rendering Moyer, at one point, unable to feel "anything" for twenty or thirty seconds. While Defendant restrained Moyer, Nester produced a knife and cut Moyer in the chest. During the ordeal, Defendant, who was smoking cigarettes, used a lit cigarette to burn Moyer's testicles. Eventually, Defendant pulled Moyer to his feet, threw Moyer into a thorn bush and told Moyer to crawl through the bush.

After Moyer had crawled from the bush, he was told to wash his body and the club in a nearby pond and to get dressed. Moyer complied. After washing, Moyer was forced back into the car, with Defendant, again, in the backseat and the blindfold put over Moyer's eyes. As previously, Defendant repeatedly punched and slapped Moyer in the face and head, while Moyer cried, asking Defendant to stop hitting him and saying that he wanted to go home.

After riding for some time, Moyer believed the car stopped at Defendant's residence, because Moyer heard Defendant's step-daughter talking. Defendant exited the car and returned. The vehicle then began to move and Moyer heard tapping on metal, and clicking sounds, and felt a metal object touch his head. Defendant asked Moyer, if he "liked that," and, if it "felt good." Moyer screamed and asked Defendant to stop. About one-half hour after leaving Defendant's home, the vehicle stopped and Moyer, while blindfolded, was removed from the car, and forced to walk up a hill in a wooded area. Moyer was ordered to and did get on his hands and knees. An object was placed against Moyer's forehead and Defendant asked Moyer if he wanted to die. Moyer said, "no," and cried. Moyer heard a clicking sound near his face, after which Defendant told Moyer that it, "must be [his] lucky day."

The blindfold was removed. Moyer saw Defendant holding a black handgun. Defendant taunted Moyer about his wanting to die, put the gun against Moyer's head and pulled the trigger. Nothing happened. Defendant again referenced that it must be Moyer's, "lucky day," put a clip in the gun, put a bullet in the chamber, placed the gun about six to eight inches aside of [sic] Moyer's head, and fired about six rounds from the weapon. During the incident, while the gun was under Defendant's control and its barrel pointed towards Moyer's face, Defendant ordered Moyer to place his thumb on the trigger. Moyer did so. Defendant then told Moyer that, as Moyer's prints were on the gun, the incident would appear to be a suicide. Defendant ordered Moyer to fire the weapon, stating that he (Moyer) could shoot himself. Moyer, however, fired the gun behind his head. Defendant then took the weapon.

Defendant ordered Moyer to stand up and directed Moyer to walk down a trail. Moyer, blindfolded again, did so. Moyer then was forced to sit down, Defendant placed a plastic barrel over Moyer's head and hit it with a pipe. Upon Moyer's later removing the barrel and blindfold from his head, he heard Nester, who was talking on a cell phone, state that the "cops" were looking for Moyer. Defendant replied, "if I'm going to jail, I'm going to make it worth it."

Moyer was blindfolded again, told to get back into the vehicle, and made to lie down. Nester drove the vehicle for thirty to forty-five minutes while Defendant taunted Moyer. Eventually, the car stopped, Defendant told Moyer to get out of the vehicle, returned Moyer's spark plug wires and car keys, and Nester and Defendant left the area. Moyer walked several miles in the dark until he came to a market where he called his wife. Police were contacted and found Moyer at the market. Although Moyer did not immediately express a desire to press charges against Defendant, as he had been threatened by Defendant about doing so, the police, nevertheless, took photographs of Moyer's injuries (which were exhibited to the jury), and pursued an investigation.

Trooper Bernard Walasavage testified that on August 11, 2002, he had gone to Clouser's mini-market after being dispatched to respond to a disturbance. Trooper Walasavage interviewed store personnel and customer witnesses and reviewed a store surveillance videotape depicting Defendant's initial confrontation with Moyer—which also was shown to the jury at trial. Trooper Walasavage testified that he was present during the police search of Defendant's home on August 13, 2002, when clothing matching that worn by Defendant during the incident—namely, white pants and a sleeveless white shirt—was found. The pants were located at the bottom of a hamper. The shirt was found under a bed, wrapped around a gun. During the search, Defendant's wife, who indicated she was attempting to look for the items being sought by police, did not retrieve or reach for the shirt under the bed until she was specifically directed by police to do so. According to Trooper Walasavage, the shirt and pants appeared to be stained by blood. Expert analysis later confirmed the presence of human blood on the clothing.

Trooper Bernard Spece testified that he had recovered the club (identified by Moyer at trial as the one used in the assault), certain knives[,] and bandanas from Nester's residence. Trooper David Mayes testified that he had gone to Defendant's home late in the evening on August 11, 2002. Defendant, who was present with Nester, was angry, confrontational and denied having been involved in an assault on Moyer, despite being advised of the depiction on the store's surveillance tape. Trooper Mayes also examined a wooded area behind Nester's home, where he found cigarette butts, 9–mm shell casings, and a live 9–mm round on the ground, together with a slug embedded in a nearby bank. The parties stipulated that the weapon confiscated from Defendant's home was operable, and that the shell casings found near Nester's home had been discharged from the gun in question.

Defendant presented testimony from his wife and numerous character witnesses. Defendant's wife testified that sometime on August 11, 2002, Nester arrived with Defendant and Moyer at her home. Moyer looked like he had been slapped, was crying, and stated he was sorry for raping her daughter. De-

fendant's wife claimed she initially did not provide the police the gun, which the police later confiscated, as she had been too short in stature to reach it. She also claimed that the confiscated shirt had not been wrapped around the gun and that she often had fired a handgun in the area by Nester's home.

Trial Court Opinion, 5/4/04, at 3–8.

¶ 3 During deliberations, the jury asked the trial court "which charge only pertains to the gun, and if not, please define count 13, recklessly endangering another person." N.T., 9/8–10/2003, at 432. The trial court instructed the jury that possession of a gun was not an essential element of most of the charges, but the jury could consider Appellant's gun possession (or lack thereof) in the totality of the circumstances. *Id.* at 432–433. The court did note, however, that Count 8 (Possessing Instruments of Crime) charges Appellant with possessing a "firearm and/or a club." *Id.* at 434. The court also noted that Count 13 (Recklessly Endangering Another Person) alleged that Appellant fired a gun in close proximity to the victim's head. *Id.* at 436.

¶ 4 Appellant was convicted of the following offenses:

Count 1: Kidnapping

Count 3: Conspiracy

Count 5: Aggravated Assault (attempted bodily injury with a deadly weapon, and causing bodily injury with a deadly weapon: namely, a club) [1]

Count 6: Unlawful Restraint

Count 7: Terroristic Threats

Count 8: Possessing Instruments of Crime (a firearm "and/or" a club)

Count 9: Prohibited Offensive Weapon (a club) [2]

Count 11: Simple Assault (attempting/causing bodily injury, and negligently causing bodily injury with a deadly weapon: namely, a club) [3]

Count 12: Simple Assault (physical menace).

Docket Entry 41. Appellant was acquitted of Count 4: Aggravated Assault (attempted serious bodily injury), and Count 13: Recklessly Endangering Another Person (by firing a gun in close proximity to the victim's head). *Id.*[4]

¶ 5 The Commonwealth pursued a motion to impose a mandatory minimum sentence of five to 10 years under 42 Pa. C.S.A. § 9712 for visible possession of a firearm. At sentencing, the court found by preponderance of the evidence that Appellant visibly possessed a firearm in the course of the kidnapping.[5] On December

---

1. *See,* N.T., 9/8–10/2003, at 433 (the alleged deadly weapon was a club).

2. *See,* N.T., 9/8–10/2003, at 428 (the alleged prohibited offensive weapon was a club).

3. *See,* N.T., 9/8–10/2003, at 430 (the alleged deadly weapon was a club).

4. The Commonwealth did not pursue Count 2 (criminal solicitation to commit kidnapping) or Count 10 (theft). In Count 4, Appellant was acquitted of aggravated assault under § 2702(a)(1) (attempting to cause serious bodily injury). In Count 5, Appellant was found guilty of two alternative versions of aggravated assault under § 2702(a)(4) (attempting and causing bodily injury with a deadly weapon).

Despite the fact that the Commonwealth successfully pursued two theories under § 2702(a)(4), the conviction was for only one count. Count 11 contains two different theories of simple assault, but they involve different sections of the statute: namely, § 2701(a)(1) (attempting or causing bodily injury), and § 2701(a)(2) (negligently causing bodily injury to another with a deadly weapon). In Count 12, Appellant was convicted of simple assault under § 2701(a)(3) (attempting by physical menace to put another in fear of imminent serious bodily injury).

5. The record reflects that the court was reluctant to impose the mandatory minimum, but felt constrained to do so because the Com-

29, 2003, the court sentenced Appellant as follows:

Count 1: Kidnapping: mandatory minimum prison term of five to 10 years.

Count 3: Conspiracy to Commit Kidnapping: mandatory minimum prison term of five to 10 years, concurrent to Count 1 (Kidnapping).

Count 5: Aggravated Assault: prison term of nine to 24 months, concurrent to Count 1.

Count 6: Unlawful Restraint: merges with Count 1.

Count 7: Terroristic Threats: prison term of six to 23 months, concurrent to Count 1.

Count 9: Prohibited Offensive Weapon: prison term of one to 23 months, concurrent to Count 1.

Count 11: Simple Assault: prison term of six to 23 months, concurrent to Count 1.

Count 12: Simple Assault: no further penalty.

Docket Entry 30.[6] Appellant filed post-sentence motions, which were denied. This appeal followed.[7]

¶ 6 Appellant raises four issues:

1. Should the mandatory sentence of 5 years in this case be vacated where the sentencing judge imposed the mandatory sentence provisions of 42 Pa.C.S.A. § 9716[sic] in violation of *Blakely v. Washington?*

2. Is the mandatory sentence imposed in this case a violation of defendant's double jeopardy protection where the jury specifically acquitted defendant of all gun related charges?

3. Were [sic] the commission of the acts charged as kidnapping merely incidental to the commission of the crimes of assault and not the kind of evil that the kidnapping statute was designed to address?

4. Were the pictures of the secluded, wooded area, the gun, bullets, and ballistics and blood tests inadmissible?

Appellant's Brief at 1.[8]

 ¶ 7 First, Appellant argues that the

monwealth sought that penalty. N.T., 12/29/2003, at 55–56. The court commented:

And I believe that it is a case where I should have discretion in determining the appropriate sentence. In that regard, I find that it is appropriate that the guidelines be used that include, are drawn up to indicate deadly weapon used. However, the Commonwealth has asked that I not be able to use my discretion in sentencing the defendant. I am very unhappy that this is the case because in following my oath of office and what I must do, I find that the Commonwealth has presented sufficient evidence that I must find by a preponderance of the evidence that Section 9712 of Title 42 applies, that I must find that the defendant visibly possessed a firearm that placed the victim in reasonable fear of death or serious bodily injury during the commission of the offenses as defined by the law that may be subject to the mandatory sentence.

The record also reflects that the trial court did not harshly condemn Appellant's actions, as it was inclined to believe that Appellant was provoked by Moyer's actions. The above reflects that, while the court would have sentenced Appellant within the guidelines, if it had had the discretion to do so, it was required to impose a mandatory minimum.

6. Appellant's sentence also included fines, costs, restitution, and community service.

7. On June 10, 2004, the trial court ordered Appellant to file and serve on the court within 14 days a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied on June 24, 2004. The trial court's Rule 1925 opinion dated August 17, 2004, addresses issues contained in the Concise Statement. The Rule 1925 opinion also incorporates the court's earlier opinion dated May 4, 2004.

8. Counsel is admonished that Pa.R.A.P. 2118 states: "The summary of argument shall be a **concise** summary of the argument.... The

trial court violated *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), by imposing a mandatory minimum sentence on Appellant for committing a crime while possessing a firearm, even though the jury had not found that Appellant had committed the crime with a firearm. Appellant argues that such a judicial finding violates his Sixth Amendment right to have a jury determine this fact.

¶ 8 Recently, this Court noted that "there is conflicting authority in the Superior Court regarding whether a constitutional challenge to a statute requiring a mandatory **minimum** sentence represents a challenge to the legality of the sentence or the discretionary aspects of sentencing." *Commonwealth v. Forbes,* 867 A.2d 1268, 1276 (Pa.Super.2005).[9] In either event, we will proceed to the merits.

We begin our analysis by recognizing that there is a strong presumption in the law that legislative enactments do not violate the constitution. Moreover, there is a heavy burden of persuasion upon one who challenges the constitutionality of a statute. As a matter of statutory construction, we presume the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth. A statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution; all doubts are to be resolved in favor of finding constitutionality.

*Id.* (citations omitted).

¶ 9 The Sentencing Code provides for a mandatory minimum sentence of five years of total confinement when a defendant visibly possesses a firearm while committing the crime of kidnapping or of any other numerous crimes. 42 Pa.C.S.A. §§ 9712(a), 9714(g). This sentencing enhancement factor need be proven only by a preponderance of the evidence at the sentencing hearing. 42 Pa.C.S.A. § 9712(b); *Commonwealth v. Wright,* 508 Pa. 25, 494 A.2d 354 (1985), *aff'd sub nom., McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Where the mandatory minimum term exceeds the sentencing guidelines, the mandatory minimum overrides the guidelines. 42 Pa. C.S.A. § 9712(a); 204 Pa.Code § 303.9(h). Indeed, in Appellant's case, the mandatory minimum sentence of five years exceeded the aggravated range of the guidelines for kidnapping. *See,* 204 Pa.Code § 303.16 (with an offense gravity score of 10 and prior record score of 0, guidelines call for standard range minimum term of 22 to 36 months; plus or minus 12 months for aggravated range and mitigated range).

¶ 10 As noted above, Appellant argues that the trial court's application of § 9712 is unconstitutional under *Blakely.* Before addressing *Blakely,* we will begin our discussion with *McMillan.* In *McMillan,* the United States Supreme Court rejected due process and Sixth Amendment challenges to § 9712, the very statute at issue in this case. The Court held that visible possession of a firearm was merely a sentencing factor, rather than an element of any given offense. Thus, allowing a mandatory minimum sentence to be imposed by the trial court by a preponderance of the evidence did not deprive defendants of the right to

summary of argument **should not exceed one page** and should **never exceed two pages.**" (Emphasis added.) Appellant's four-page summary of argument is grossly excessive.

9. To the extent that the claim raises a challenge to the discretionary aspects of sentencing, we note that Appellant preserved it by filing post-sentence motions and a Concise Statement. If it is a challenge to the legality of the sentence, it is never waived. *Forbes.*

have all elements of the offense be decided by the jury beyond a reasonable doubt.

¶ 11 Later, in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that a defendant's Sixth Amendment right to a jury trial encompasses the right to have "any fact that increases the penalty for a crime beyond the prescribed statutory maximum [be] submitted to the jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. *Apprendi* struck down a New Jersey statute that allowed for a sentence above the otherwise-applicable statutory maximum, if the trial court found by a preponderance of the evidence that the crime was motivated by racial animus.

¶ 12 The *Apprendi* Court specifically noted that its holding did not overrule *McMillan*. The Court reasoned as follows:

> Section 9712 neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm.... The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense. Petitioners' claim that visible possession is 'really' an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punishment, but it does not.

[*McMillan* ], 477 U.S. at 87–88[, 106 S.Ct. 2411] [citation omitted].

> ... We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself.

*Apprendi*, 530 U.S. at 486–487 & n. 13, 120 S.Ct. 2348.

¶ 13 In *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), the United States Supreme Court analyzed the constitutionality of a federal statute, analogous to § 9712, which provided a mandatory minimum sentence for "brandishing" a firearm. The Court took the opportunity to squarely decide whether *McMillan* should be overruled in light of *Apprendi*. A majority of the Court held that *McMillan* should not be overruled. Four Justices reasoned that *Apprendi* was logically distinguishable from *McMillan* because *Apprendi* concerned extending the statutory maximum, while *McMillan* concerned mandatory minimums. Justice Breyer also declined to overrule *McMillan*, but on a different basis. He reasoned that there was no strong logical basis for distinguishing *McMillan* from *Apprendi*. Nevertheless, he reasoned that: (1) "the Sixth Amendment permits judges to apply sentencing factors—whether those factors lead to a sentence beyond the statutory maximum (as in *Apprendi* ) or the application of a mandatory minimum (as here)"; and (2) "extending *Apprendi* to mandatory minimums would have adverse practical, as well as legal consequences." *Id.* at 569–570, 122 S.Ct. 2406 (Breyer, J., concurring). Thus, five Justices declined to overrule *McMillan* in light of *Apprendi*.[10]

---

**10.** In dissent, Justices Thomas reasoned that *McMillan* should be overruled in light of *Ap-* *prendi*. *Harris*, 536 U.S. at 573, 122 S.Ct. 2406 (Thomas, J., dissenting). Justices Ste-

¶ 14 In *Blakely*, the Court refined *Apprendi* and held that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose **solely on the basis of the facts reflected in the jury verdict or admitted by the defendant**." *Blakely*, 124 S.Ct. at 2537 (emphasis in original).

¶ 15 The Court then applied those rules to Washington's determinate guidelines sentencing scheme, and the facts of Blakely's case. Defendant Blakely had kidnapped his wife and forced her into a wooden box. He was convicted of kidnapping, which carried an absolute maximum term of 10 years. *Id.* at 2535. The Washington State guidelines provided for a standard range sentence of 49 to 53 months. *Id.* At sentencing, the trial judge found by a preponderance of the evidence that Blakely had acted with deliberate cruelty. In Washington, this additional factual finding authorized an aggravated sentence. The court imposed an aggravated sentence which was 37 months beyond the standard range.

¶ 16 The Supreme Court noted that in Washington's determinate sentencing scheme, the trial judge had no statutory authority to impose a sentence beyond the standard range, unless it found an aggravating factor such as deliberate cruelty. *Id.* at 2535–2536. In other words, the jury's verdict, standing alone, only authorized a standard range sentence. *Id.* Thus, for *Apprendi* purposes, the statutory maximum in a determinate guidelines

scheme was the standard range. Because the court unlawfully imposed a sentence beyond this maximum, it was unconstitutional. *Id.*

¶ 17 Once again, however, the Court distinguished *McMillan.* The court reasoned that *"McMillan* involved a sentencing scheme that imposed a mandatory **minimum** if a judge found a particular fact. We specifically noted that the statute 'does not authorize a sentence in excess of that otherwise allowed for [the underlying] offense.'" *Id.* at 2538 (emphasis in original), *quoting, McMillan,* 477 U.S. at 82, 106 S.Ct. 2411.

¶ 18 In *United States v. Booker,* ──── U.S. ────, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Court held that the *Apprendi/Blakely* rules apply to the federal sentencing guidelines, because the federal guidelines are a determinate sentencing scheme. *Id.* at 749–750. The Court specifically held that the result would be different if the federal guidelines were merely advisory, rather than mandatory. *Id.* at 750.[11] In accord with this reasoning, this Court has held that *Blakely* "does not implicate the Pennsylvania scheme, where there is no promise of a specific sentence, and a judge has discretion to sentence in the aggravated range so long as he or she provides reasons for the sentence." *Commonwealth v. Bromley,* 862 A.2d 598, 603 (Pa.Super.2004).[12]

¶ 19 In short, *McMillan* remains good law. Unlike *Apprendi,* the imposition of a mandatory minimum sentence under

---

vens, Souter, and Ginsburg joined this opinion.

**11.** In *Booker,* the Supreme Court held that the proper remedy was to excise certain sections of the Federal Sentencing Act. As amended by the Court, "the Federal Sentencing Act ... makes the Guidelines effectively advisory." *Id.* at 757.

**12.** *See also, Commonwealth v. Moss,* 871 A.2d 853, 856 (Pa.Super.2005) *(Blakely* does not apply to a trial court's decision to sentence in the standard range rather than the mitigated range); *Commonwealth v. Druce,* 868 A.2d 1232, 1239–1240 (Pa.Super.2005) *(Blakely* does not invalidate the trial court's power to sentence in the aggravated range of the guidelines); *Commonwealth v. Smith,* 863 A.2d 1172, 1178–1179 (Pa.Super.2004) (same).

§ 9712 does not increase (or even implicate) the absolute statutory maximum. Next, *Harris* declined to overrule *McMillan.* Further, nothing in *Blakely* or *Booker* suggests that *McMillan* should be overruled. Unlike *Blakely* and *Booker,* Pennsylvania does not have a determinate scheme whereby the guidelines form a *de facto* statutory maximum.

■■■ ¶ 20 Thus, even if the mandatory minimum sentence of five years exceeds the standard guideline range or the aggravated range of the sentencing guidelines for any given offense, this fact would not pose a *Blakely* problem. The key question is whether the jury's verdict vested the trial court with the authority to impose a five-year sentence. The answer is yes. In Pennsylvania, the jury's verdict vests the court with authority to impose any sentence up to the statutory maximum. *See, Smith,* 863 A.2d at 1178–1179. Unlike the federal guidelines or the Washington State guidelines, the Pennsylvania guidelines are not mandatory, and thus do not prohibit any particular sentence within the statutory maximum. *Blakely; Commonwealth v. Mouzon,* 571 Pa. 419, 812 A.2d 617, 621 (2002) (plurality). Of course, the guidelines and the Sentencing Code are designed to rein in unfettered judicial discretion in sentencing. *Mouzon; `Commonwealth v. Walls,* 846 A.2d 152 (Pa.Super.2004), *appeal granted,* 875 A.2d 1075 (Pa.2005). The mere fact that the

mandatory minimum divests courts of the discretion to impose a lower sentence does not implicate constitutional concerns. *Booker.* For these reasons, we hold that *Blakely* does not apply to the imposition of a mandatory minimum sentence under § 9712.[13]

¶ 21 Before concluding, we will briefly address Appellant's claim that as a practical matter, sentencing courts often do sentence within the standard range of the guidelines because the facts of the case do not warrant a departure. He further claims that defendants often reasonably expect a guideline sentence. Specifically, Appellant argues that the trial judge was clearly inclined to sentence him in the standard range, if not the mitigated range. Appellant concludes: "it cannot be said that Pennsylvania's sentencing scheme does not *entitle* a Defendant to a certain sentence." Appellant's Brief at 22.

¶ 22 Appellant's argument is intriguing, given this Court's discussion of discretionary limitations in *Walls.* Nevertheless, we decline to adopt it in light of the prevailing precedent from the United States Supreme Court continuing to uphold mandatory minimum sentences in the context of indeterminate sentencing schemes. The United States Supreme Court has already provided a framework for analyzing claims such as Appellant's; under that framework, the trial court's application of § 9712 was constitutional.[14] Appellant's first claim fails.

**13.** It may appear, at first blush, that *Blakely* does not apply because visible possession of a firearm was a fact "reflected" in the jury's verdict. This is not necessarily true, however. The Commonwealth did present evidence on this fact, but the jury's verdict did not necessarily show that the jury accepted this to be true. Most of the crimes for which Appellant was convicted did not require the jury to find beyond a reasonable doubt that Appellant visibly possessed a firearm. For the crime of possessing instruments of crime, the Commonwealth charged that Appellant possessed

a gun **and/or a club.** The jury was not asked to identify which weapon Appellant possessed. Thus, it is entirely possible that the jury found Appellant guilty of possessing the club, not the gun. Thus, we will assume *arguendo* that the element of visible possession of a firearm was not already reflected in the jury's verdict.

**14.** Appellant contends that "the Supreme Court is so divided that this issue will be revisited as the inequities of the mandatory sentencing schemes of this state become ap-

 ¶ 23 Next, Appellant raises a number of concerns based on the premise that the **jury** "specifically rejected the existence of a gun," but the **court** increased Appellant's sentence by finding as a fact that Appellant visibly possessed a firearm. Appellant's Brief at 25. Appellant suggests that this sequence of events violates double jeopardy and collateral estoppel principles. *Id.* at 23–26.

 ¶ 24 Issues which are not adequately supported by citations to pertinent legal authority are waived. *Commonwealth v. Alsop,* 799 A.2d 129, 135 (Pa.Super.2002) (*en banc*); Pa.R.A.P. 2119. In the instant case, Appellant fails to develop these claims in a meaningful fashion. Thus, they are waived. In any event, we note that Appellant's premise is faulty. The record does not reflect that the jury specifically rejected the existence of a gun. The jury only acquitted Appellant of two crimes: Aggravated Assault (attempted serious bodily injury) and REAP (by firing a gun in close proximity to the victim's head). The acquittal for aggravated assault sheds no light on whether Appellant possessed a gun. Similarly, the acquittal for REAP may reflect a finding that Appellant possessed a gun, but did not **use** it in the specific manner alleged by the Commonwealth. We also note that Appellant was convicted of possession of instruments of crime. The Commonwealth charged that Appellant possessed a club **and/or a gun.** Thus, it is possible that the jury convicted Appellant of possession of a gun. This claim fails.

¶ 25 Next, Appellant argues that the evidence was insufficient to support the charge of kidnapping, because transporting and detaining the victim was merely incidental to the essential crime of assault.

¶ 26 Our standard of review is as follows:

"The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Heberling,* 451 Pa.Super. 119, 678 A.2d 794, 795 (Pa.Super.1996) (citing *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994)). In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the factfinder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Cassidy,* 447 Pa.Super. 192, 668 A.2d 1143, 1144 (Pa.Super.1995) (citations omitted). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth v. Valette,* 531 Pa. 384, 388, 613 A.2d 548, 549 (1992) (citations and quotation marks omitted).

*Commonwealth v. Vetrini,* 734 A.2d 404, 406–407 (Pa.Super.1999).

parent." Appellant's Brief at 23. Time will tell if Appellant is correct.

¶ 27 The Crimes Code defines kidnapping as follows:

### § 2901. Kidnapping

**(a) Offense defined.**—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

(1) To hold for ransom or reward, or as a shield or hostage.

(2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

**(b) Grading.**—Kidnapping is a felony of the first degree. A removal or confinement is unlawful within the meaning of this section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 years or an incapacitated person, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

18 Pa.C.S.A. § 2901. The kidnapping statute is not designed to criminalize every sort of incidental transportation or detention which may take place during the commission of another crime. *Commonwealth v. Hughes,* 264 Pa.Super. 118, 399 A.2d 694, 696 (1979). Such trivial movements of the victim generally do not substantially increase the risk of harm to the victim. *Id.* On the other hand, "the statute will apply notwithstanding the fact that the defendant intended to commit another offense after unlawfully transporting the victim." *Commonwealth v. Dehoniesto,* 425 Pa.Super. 83, 624 A.2d 156, 160 (1993).

¶ 28 In the instant case, the record reflects that Appellant transported the victim a substantial distance to a secluded, wooded area, and assaulted him. The evidence supports a finding that Appellant exposed the victim to an increased risk of harm by taking him away from the protections of society. *Dehoniesto; Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 780 (2004). Moreover, the record reflects that Appellant transported the victim to the woods "to facilitate commission of [a] felony" (such as aggravated assault), and/or "to inflict bodily injury on or to terrorize the victim[.]" 18 Pa.C.S.A. § 2901(a)(2),(3); *Dehoniesto; Malloy; see also, Commonwealth v. Auker,* 545 Pa. 521, 681 A.2d 1305, 1316 (1996) (evidence sufficient for kidnapping where defendant unlawfully took victim to a distant location with the intent to harm and/or terrorize her). The record does not reflect mere incidental movement that is collateral to the commission of a different crime. Appellant's third claim fails.

¶ 29 Next, Appellant argues that the trial court abused its discretion by admitting photographic evidence of the wooded area, because the victim could not authenticate that he was taken to the area depicted in the photographs.

¶ 30 Our standard of review, and the relevant legal standards, are as follows:

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. The requirement of authentication or identification is codified at Pennsylvania Rule of Evidence 901, 42 Pa.C.S.A.: "(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the

matter in question is what its proponent claims." Pa. R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence. Pa. R.E. 901(b)(1).

*In the Interest of F.P.*, 2005 PA Super 220, ¶ 6, 878 A.2d 91 (citations omitted). Abuse of discretion is shown in the record where the court does not apply the law in reaching judgment, or exercises manifestly unreasonable judgment, or judgment that is the result of partiality, prejudice, bias, or ill will. *Commonwealth v. King*, 576 Pa. 318, 839 A.2d 237, 240 (2003).

¶ 31 The record reflects that the premise of Appellant's argument is flawed. The Commonwealth did not introduce general photographs of the wooded area where Appellant claimed to have been taken. The Commonwealth did introduce close-up photographs of the ground where troopers found shell casings, bullets, and shrapnel. Those items are depicted in the photographs. The troopers adequately authenticated the photographs at trial by testifying about their personal knowledge of the information in the photographs. N.T., 9/8–10/2003, at 248–250. This claim fails.

■ ¶ 32 Next, Appellant argues that the gun and ballistics evidence was inadmissible because no-one "authenticated" that the gun and/or bullet casings were related to the events of the night in question.

¶ 33 The record reflects the following. Moyer, the victim, testified that Appellant took him to a secluded area, aimed a gun near his head, and fired approximately six shots. The Commonwealth later introduced into evidence a gun that was found in Appellant's home. The Commonwealth also introduced a number of shell casings that were found in a secluded area which matched the gun that was retrieved from Appellant's home.

¶ 34 The victim never claimed that the gun introduced into evidence by the Commonwealth was the actual gun used on the night in question. Thus, the victim was not required to "authenticate" this fact with personal knowledge. The Commonwealth simply claimed that the gun was found in Appellant's home, and that the shell casings were found in a secluded area. These facts were properly authenticated by the police, when they testified through personal knowledge that they confiscated these items. *See*, Pa.R.E. 901 ("testimony of a witness with personal knowledge **that a matter is what it is claimed to be** may be sufficient to authenticate or identify the evidence.") The police did not testify that Appellant used the gun on the night in question. Thus, the police were not required to "authenticate" this fact at trial. In short, Appellant is attempting to attack the **weight** of this evidence through the improper guise of authentication.[15] This claim fails, because it is the exclusive province of the jury to determine the weight of relevant evidence. *Vetrini*.

■ ¶ 35 Finally, Appellant argues that the blood evidence was irrelevant. Again, "admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *F.P.*, 2005 PA Super 220, ¶ 6, 878 A.2d 91. Evidence is relevant if it tends to make a

---

**15.** Appellant does not seriously contend that this evidence was irrelevant. "Although appellant does not raise the issue of relevancy, we note [the evidence was] clearly relevant as [it] related to an issue in the truth-determining process, *i.e.*, the guilt or innocence of appellant." *F.P.*, 2005 PA Super 220, ¶ 13 n. 6, 878 A.2d 91.

material fact more or less probable. Pa. R.E. 401.

¶ 36 In the instant case, the Commonwealth presented expert evidence that human blood was found on both the shirt and the pants that Appellant was wearing on the night in question. The expert could not determine whose blood was on the clothing, because there was not enough blood to conduct such a test. N.T., 9/8–10/2003, at 269. The presence of blood on Appellant's clothes bolsters the Commonwealth's position that Appellant participated in a violent attack on the victim. The weight of this evidence was for the jury to determine. *Vetrini.* We see no abuse of discretion in the court's decision to admit this evidence. Appellant's final claim fails.

¶ 37 Judgment of sentence affirmed.