J-S47036-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| HASAN IB ADBULLAH-TALIB, | : | |
| | : | |
| Appellant | : | No. 2100 MDA 2014 |

Appeal from the Judgment of Sentence Entered October 17, 2014,
in the Court of Common Pleas of Dauphin County,
Criminal Division, at No(s): CP-22-CR-0004469-2013

BEFORE: ALLEN, OTT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.: **FILED SEPTEMBER 04, 2015**

Hasan Ib Adbullah-Talib (Appellant) appeals from a judgment of sentence entered after a jury convicted him of deceptive business practices, theft by deception, bad checks, and criminal conspiracy. We affirm.

The trial court summarized the background underlying this matter as follows.

> [Appellant's] charges stem from the purchase of motor vehicle safety inspection and emission stickers for the purported use at an inspection service station[, Valley Auto. In short, Appellant and at least two other men, Edward Boykin (Boykin) and Nathaniel Shoatz (Shoatz), set up Valley Auto as a sham business and then purchased 4,000 safety inspection stickers and 5,000 emission stickers from the Pennsylvania Department of Transportation (PennDOT). The $8,000 check that the men utilized to purchase the stickers was dishonored. Moreover, the record suggests that Valley Auto never did any business.[1]] A

---

[1] In its opinion, the trial court provides a thorough and accurate summary of the evidence presented at trial. Trial Court Opinion, 4/30/2015, at 3-14. We adopt that portion of the court's opinion for purposes of this appeal.

*Retired Senior Judge assigned to the Superior Court.

jury trial was held on August 19-21, 2014, at which time Appellant was found guilty of all charges. Appellant was sentenced on October 17, 2014 to an aggregate term of incarceration of eighteen [] to eighty-four [] months in a state correctional institution along with payment of the costs of prosecution and fines totaling $7,[8]00. Appropriate time credit was applied and Appellant was made RRRI eligible.

Appellant's timely post-sentence motion challenged the fine imposed as excess[ive] and requested a new trial or arrest of judgment contending the verdict rendered was against the weight of the evidence. The post-sentence motion was denied… on December 1, 2014. On December 10, 2014, Appellant filed a timely notice of appeal…. [Both Appellant and the trial court complied with Pa.R.A.P. 1925.]

Trial Court Opinion, 4/30/2015, at 1-2 (unnecessary capitalization omitted).

On appeal, Appellant asks us to consider the questions that follow.

[1.] Whether the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions where the Commonwealth failed to prove that Appellant: made a false, misleading, or material statement; agreed with the co-defendant(s) to engage in conduct which constitutes a crime or an attempt or solicitation to commit a crime; intended to commit conspiracy; received property or intended to receive property by deception; or knew the check in question would not be honored?

[2.] Whether the trial court erred in refusing to instruct the jury regarding 18 Pa.C.S.A. 4105(b)(1), Presumptions, where such error constituted an abuse of discretion and error of law as the instruction was supported by the evidence in record?

[3.] Whether the trial court erred in permitting an amendment to the criminal information where: Appellant was not fully apprised of the charges against him; the crimes specified in the original information did not involve the same basic elements or arise out of the same factual situation as the crimes specified in the amended information; Appellant was not placed on notice regarding his alleged criminal conduct, and; Appellant was prejudiced?

[4.] Whether the trial court erred in admitting a copy of the check used to purchase inspection stickers where such evidence was not properly authenticated?

[5.] Whether the trial court erred in admitting evidence regarding the quantity of inspection stickers previously sold in a single transaction where such evidence was irrelevant and where the prejudicial nature of the evidence substantially outweighed its probative value?

[6.] Whether the trial court erred in denying Appellant's Post-Sentence Motion where the jury's verdict was against the weight of the evidence so as to shock one's sense of justice where the Commonwealth failed to prove that Appellant committed the crimes charged?

[7.] Whether the trial court erred in denying Appellant's Post-Sentence Motion where Appellant's fine was excessive and unreasonable and constitutes too severe a punishment in light of the gravity of the offense, the impact on the community, and Appellant's rehabilitative needs. The punitive measures inherent in the sentencing scheme could have been accomplished by the imposition of a lesser fine?

Appellant's Brief 12-13 (suggested answers omitted).[2]

As to the first issue, Appellant claims that the Commonwealth failed to present sufficient evidence to support his various convictions.

Our standard of review in determining whether the evidence was sufficient

> requires that we consider the evidence admitted at trial in a light most favorable to the Commonwealth, since it was the verdict winner, and grant it all reasonable inferences which can be derived therefrom. The evidence, so viewed, will be deemed legally sufficient to sustain the jury's conviction on appeal only if it proves each element of the offense charged beyond a reasonable doubt.

---

[2] We have reordered Appellant's issues.

***Commonwealth v. Poland***, 26 A.3d 518, 521 (Pa. Super. 2011) (citation omitted).

We begin by addressing Appellant's challenge regarding his bad checks conviction. Appellant's Brief at 51-55. Appellant was convicted of violating 18 Pa.C.S. § 4105(a)(1), which provides, "A person commits an offense if he issues or passes a check or similar sight order for the payment of money, knowing that it will not be honored by the drawee." The thrust of Appellant's argument is that the Commonwealth failed to present any evidence that he knew the $8,000 check would be dishonored.

Despite failing to address the merits of the remainder of Appellant's sufficiency challenges in its 1925(a) opinion, the trial court did address Appellant's sufficiency argument regarding his bad-checks conviction. [3] After

---

[3] As we noted above, in a post-sentence motion, Appellant challenged the weight of the evidence presented at trial. The trial court denied that motion. Appellant claimed in his Pa.R.A.P. 1925(b) statement, *inter alia*, that the court erred by rejecting his weight claim and that the Commonwealth failed to present sufficient evidence to support his convictions.

In its Pa.R.A.P. 1925(a) opinion, the trial court properly observed that a challenge to the weight of the evidence concedes that sufficient evidence exists to sustain the jury's verdict. Trial Court Opinion, 4/30/2015, at 27 (quoting ***Commonwealth v. Rossetti***, 863 A.2d 1185, 1191-92 (Pa. Super. 2004)). Based upon this legal proposition, the court determined that it need not address Appellant's sufficiency-of-the-evidence issues. ***Id.*** at 28. In other words, the court determined that Appellant's challenges to the weight of the evidence were lethal to his challenges to the sufficiency of the evidence. This determination is inaccurate. Indeed, appellants often raise these alternative arguments, and this Court addresses the merits of each argument separately. ***See***, ***e.g.***, ***Commonwealth v. Tejada***, 107 A.3d 788 (Pa. Super. 2015).

a review of the certified record and the parties' briefs, we conclude that the trial court's opinion adequately addresses and properly rejects this argument. We therefore adopt that portion of the court's opinion in response to Appellant's argument on appeal. Trial Court Opinion, 4/30/2015, at 30-32.

Regarding Appellant's deceptive-business-practices conviction, the jury determined that he violated 18 Pa.C.S. § 4107(6), which provides, "A person commits an offense if, in the course of business, the person … makes or induces others to rely on a false or misleading written statement for the purpose of obtaining property or credit[.]" As to his theft by deception conviction, the jury concluded that Appellant violated 18 Pa.C.S. § 3922(a)(1), which states,

> A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally … creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise[.]

According to Appellant, "[t]he Commonwealth failed to prove these crimes due to their [*sic*] lack of evidence involving any actual written statement, falsehood, or false impression." Appellant's Brief at 48.

When viewed in the light most favorable to the Commonwealth, the evidence presented at trial clearly demonstrates that Appellant, in concert with Boykin and Shoatz, submitted written paperwork to PennDOT to

establish Valley Auto as a vehicle inspection station. However, that paperwork was false and misleading, as Appellant and his cohorts had no intention of running a legitimate service station. Instead, as the record amply establishes, they intended to obtain inspection and emission stickers from PennDOT with a check that was not supported with sufficient funds. Indeed, they did obtain such stickers by way of this deception. Thus, the Commonwealth presented sufficient evidence at trial to allow the jury to convict Appellant of deceptive business practices and theft by deception.

Next, we address Appellant's claim that the Commonwealth failed to present sufficient evidence to prove him guilty of criminal conspiracy. Appellant's Brief at 55-57. "A conviction for conspiracy requires only an intent to commit a crime, an agreement with a co-conspirator, and an overt act in furtherance of the conspiracy." **Commonwealth v. Thoeun Tha**, 64 A.3d 704, 711 (Pa. Super. 2013). Appellant argues, "There was no evidence offered by the Commonwealth that proves Appellant conspired to commit any crime with Mr. Boykin or any other unknown person." Appellant's Brief at 56.

At the outset, it is important to note that, although Appellant was tried and convicted of only one count of criminal conspiracy, the jury was asked to determine whether Appellant committed deceptive business practices, theft by deception, and bad checks, as well as conspiracy to commit all of those crimes with Boykin and "an unknown male," who was identified at trial as

Shoatz, Appellant's cousin. We already have determined that the evidence presented at trial was sufficient to demonstrate that Appellant committed deceptive business practices, theft by deception, and bad checks. The trial court's accurate recitation of the evidence presented at trial sufficiently demonstrates that Appellant intended to commit those crimes, that he agreed to commit those crimes with Boykin and Shoatz, and that the trio completed overt acts in furtherance of their conspiracy. Trial Court Opinion, 4/30/2015, at 3-14. Appellant's argument to the contrary is unavailing.

We now will address the second, third, fourth, and fifth issues listed above. In support of those issues, Appellant contends that the trial court erred by: refusing to instruct the jury regarding the presumptions found at 18 Pa.C.S. § 4105(b)(1), Appellant's Brief at 43-47; allowing the Commonwealth to amend the information pre-trial to include an unknown male, Shoatz, to Appellant's criminal conspiracy charge, Appellant's Brief at 33-38; allowing the Commonwealth to admit the $8,000 check at trial without authenticating it, Appellant's Brief at 38-41; and admitting into evidence irrelevant testimony regarding the quantity of inspections stickers previously sold by PennDOT employees in a single transaction, Appellant's Brief at 41-43. After a review of the certified record and the parties' briefs, we conclude that the trial court's opinion adequately addresses and properly rejects Appellant's claims. We therefore adopt those portions of the court's opinion in response to Appellant's arguments on appeal. *See* Trial Court

Opinion, 4/30/2015, at 14-17 (addressing Appellant's claim that the jury should have been charged with the presumptions found at 18 Pa.C.S. § 4105(b)(1)); *id.* at 17-19 (concluding that the court did not err by allowing the Commonwealth to amend the criminal information); and *id.* at 19-26 (holding that the court did not abuse its discretion by allowing the Commonwealth to admit the $8,000 as evidence and by allowing the Commonwealth to elicit testimony regarding PennDOT employees' concerns with the quantity of stickers Appellant and his conspirators purchased in comparison to previous purchases of which the employees were aware).

Next, we consider Appellant's contention that the jury's verdict was contrary to the weight of the evidence presented at trial. Appellant's Brief at 58-61. As this Court has explained, "a weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion." **Commonwealth v. Lofton**, 57 A.3d 1270, 1273 (Pa. Super. 2012) (citations omitted).

Appellant did file a post-sentence motion. That motion included a section entitled, "Motion for new trial or arrest of judgment." Post-Sentence Motion, 10/21/2014, at unnumbered page 2. Under that heading, Appellant averred as follows:

> [Appellant] respectfully requests a new trial or arrest of judgment and asserts that the verdict was against the weight of the evidence so as to shock one's sense of justice **where the Commonwealth never showed**, *inter alia*, that [Appellant] was actually associated with the business in question, Valley Auto, LLC, or that any false or misleading statement was put forth in regards to the business or in obtaining the emission/inspection stickers.

*Id.* (emphasis added). In this paragraph, Appellant conflated the concepts underlying challenges to the weight of the evidence and the sufficiency of the evidence. However, because Appellant ultimately contended that the Commonwealth failed to offer any evidence that Appellant was associated with Valley Auto or that he made any false or misleading statement, this claim sounds more as a challenge to the sufficiency of the evidence.

On appeal, Appellant's weight-of-the-evidence claim hinges entirely on his contention that Boykin's trial testimony was unreliable. *See*, *e.g.*, Appellant's Brief at 59 ("Appellant's convictions were against the weight of the evidence where Edward Boykin's testimony was unreliable, contradictory, and inconsistent with the remainder of the evidence presented at trial."). Appellant did not present this claim to the trial court; consequently, it is waived.

In support of his last issue, Appellant argues that the trial court imposed upon him an excessive fine. Such an issue challenges the discretionary aspects of Appellant's sentence. *See Commonwealth Fusco*, 594 A.2d 373, 374 (Pa. Super. 1991) (concluding that Fusco's claim that his

fine was excessive constituted a challenge to the discretionary aspects of his sentence).

> It is well settled that, with regard to the discretionary aspects of sentencing, there is no automatic right to appeal.

>> Before [this Court may] reach the merits of [a challenge to the discretionary aspects of a sentence], we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.... [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

*Commonwealth v. Disalvo*, 70 A.3d 900, 902 (Pa. Super. 2013) (citations omitted).

Appellant timely filed a notice of appeal; he preserved his issue in his post-sentence motion; and his brief contains a Pa.R.A.P. 2119(f) statement. Thus, we must determine whether Appellant has raised a substantial question worthy of appellate review.

>> The determination of whether a substantial question exists must be made on a case-by-case basis. It is only where an aggrieved party can articulate clear reasons why the sentence issued by the trial court compromises the sentencing scheme as a whole that we will find a substantial question and review the decision of the trial court. This [C]ourt has been inclined to find that a substantial question exists where the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of

the Sentencing Code; or (2) contrary to the fundamental norms underlying the sentencing process.

Also, a bald allegation that a sentence is excessive does not raise a substantial question.

**Commonwealth v. Lutes**, 793 A.2d 949, 964 (Pa. Super. 2002) (citations omitted).

In his post-sentence motion, Appellant merely asserted, "It is believed and therefore averred that the fine of seven thousand nine hundred ($7,900.00) dollars was a disproportionate and excessive sentence."[4] Post-Sentence Motion, 10/21/2014, at unnumbered page 2. Moreover, while Appellant's Pa.R.A.P. 2119(f) statement spans more than three pages, in substance, the statement only asserts that Appellant's sentence is excessive.[5] Appellants Brief at 29-32. We conclude that Appellant's sentencing claim amounts to nothing more than a bald allegation that his

---

[4] Appellant is incorrect that his fines totaled $7,900. For his deceptive-business-practices conviction, the trial court sentenced Appellant to pay a fine of $7,500. The court fined him $100 for each of his remaining three convictions. N.T., 10/17/2014, at 8-9. Thus, Appellant was sentenced to pay an aggregate fine of $7,800.

[5] At the end of his Pa.R.A.P. 2119(f) statement, Appellant baldly asserts, "In the case *sub judice*, the sentencing court acted contrary to the fundamental norms underlying the sentencing process by sentencing Appellant to pay a *de facto* fine equivalent to the restitution paid by Mr. Boykin, Appellant's co-defendant." Appellant's Brief at 32. This unsupported and undeveloped sentencing claim is waived, as Appellant failed to present it to the trial court. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

sentence is excessive. Consequently, Appellant has failed to raise a substantial question.

Appellant has failed to present this Court with an issue that warrants relief. Accordingly, we affirm his judgment of sentence.[6]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/4/2015

---

[6] The parties shall attach a copy of the trial court's April 30, 3015 opinion to this memorandum in the event of further proceedings.



COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
v. :
: NO.: 4469 CR 2013
: (2100 MDA 2014)
HASSAN IB ABDULLAH-TALIB :

## MEMORANDUM OPINION

Appellant, Hassan Ib Abdullah-Talib ("Appellant") is appealing this Court's judgment of sentence entered October 17, 2014. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

Appellant was arrested and charged with one count each of Deceptive Business Practices,[1] Theft by Deception,[2] Bad Checks,[3] and a count of Criminal Conspiracy[4] in connection to each of the three offenses for a total of six counts.[5] The charges stem from the purchase of motor vehicle safety inspection and emissions stickers for the purported use at an inspection service station. A jury trial was held on August 19-21, 2014, at which time Appellant was found guilty of all charges. Appellant was sentenced on October 17, 2014 to an aggregate term of incarceration of eighteen (18) to eighty-four (84) months in a state correctional institution along with the payment of the costs of prosecution and fines totaling $7,900. Appropriate time credit was applied and Appellant was made RRRI eligible.

---

[1] 18 Pa.C.S. § 4107(A)(6).
[2] 18 Pa.C.S. § 3922(A)(1).
[3] 18 Pa.C.S. § 4105(A)(1).
[4] 18 Pa.C.S. § 903(C).
[5] Counts 4 and 6 were subsequently withdrawn by the Commonwealth.

4-33

Appellant's timely Post-Sentence Motion challenged the amount of the fine imposed as excess and unreasonable and requested a new trial or arrest of judgment contending that the verdict rendered was against the weight of the evidence. The Post-Sentence Motion was denied by this Court on December 1, 2014. On December 10, 2014, Appellant filed a timely Notice of Appeal to the Pennsylvania Superior Court. In compliance with this Court's Order directing the filing of a Concise Statement of Matters Complained of on Appeal, Appellant raises the following issues for review:

1.    The trial court erred in refusing to instruct the jury regarding 18 Pa.C.S.A. § 4105(b)(1), Presumptions, where such error constituted an abuse of discretion and error of law as the instruction was supported by the evidence in record.

2.    The trial court erred in permitting an amendment to the criminal information where: Appellant was not fully apprised of the charges against him; the crimes specified in the original information did not involve the same basic elements or arise out of the same factual situation as the crimes specified in the amended information; Appellant was not placed on notice regarding his alleged criminal conduct; and, Appellant was prejudiced.

3.    The trial court erred in admitting a copy of the check used to purchase inspection stickers where such evidence was not properly authenticated.

4.    The trial court erred in admitting evidence regarding the quantity of inspection stickers previously sold in a single transaction where such evidence was irrelevant and where the prejudicial nature of the evidence substantially outweighed the probative value.

5.    The Commonwealth failed to present sufficient evidence to sustain Appellant's convictions where the Commonwealth did not prove that Appellant: made a false, misleading, or material statement; agreed with the co-defendant(s) to engage in conduct which constitutes a crime or an attempt or solicitation to commit a crime; intended to commit conspiracy; received property or intended to receive property by deception; or, knew the check would not be honored.

6.    The trial court erred in denying Appellant's Post-Sentence Motion where the verdict was against the weight of the evidence so as to shock one's of justice where the Commonwealth never showed that: Appellant

2

was associated with the business in question, agreed with the co-defendant(s) to engage in the conduct which constitutes a crime or an attempt or solicitation to commit a crime; intended to commit conspiracy; or, any false or misleading statement was put forth regarding the business or obtaining the emission/inspection stickers.

7.     The trial court erred in denying Appellant's Post-Sentence Motion where Appellant's fine was excessive and unreasonable and constitutes too severe a punishment in light of the gravity of the offense, the impact on the community, and Appellant's rehabilitative needs. The putative measures inherent in the sentencing scheme could have been accomplished by the imposition of a lesser fine.

For the reasons set forth below, this Court finds that Appellant's judgment of sentence should stand.

## FACTUAL BACKGROUND

A jury trial held on August 19-21, 2015 established the following facts: Michael Smith ("Mr. Smith") oversees the Vehicle Emissions Program for the Pennsylvania Department of Transportation ("PennDOT"). (Notes of Testimony, Trial at 36-37).[6] Mr. Smith's duties at PennDOT include the oversight of ordering, purchasing and distribution of safety and emissions stickers used in the safety inspection of motor vehicles in Pennsylvania. (N.T. at 37). Mr. Smith explained that the safety and emissions stickers are provided to certified inspection stations that have applied for and have gained approval to conduct vehicle inspections. (N.T. at 37-38).

Mr. Smith explained how a service station gains approval to perform inspections. To initiate the process, an individual or company would complete an application called PennDOT form MV-500. (N.T. at 37-39). Once the application is completed, a quality assurance officer is assigned to the request and an in-person visit to the service station

---

[6] Hereinafter "N.T."

3

is made. (N.T. at 38-39). A quality assurance officer may be a PennDOT employee or the employee of an entity contracting with PennDOT to provide the certification services. (N.T. at 38).

On the MV-500, the station owner must list the names of the individuals who are permitted to place an order for inspection stickers on behalf of the station. (N.T. at 39). Once an audit is complete and the quality assurance officer is satisfied that all necessary PennDOT requirements have been met, one of the listed individuals can place an order for the physical inspection sticker by mail order or in person at PennDOT's headquarters in Harrisburg, Pennsylvania. (N.T. at 39-40).

Mr. Jay Hawkins ("Mr. Hawkins") is contracted by PennDOT to audit state inspection facilities for compliance with the rules and requirements of the program and to certify new stations. (N.T. at 46-48). To begin the certification process an individual contacts Mr. Hawkins by phone and he asks some preliminary questions about insurance, whether the individual is certified to perform vehicle safety inspections, for the purpose of determining his or her familiarity with the vehicle inspection rules and regulations. (N.T. at 49-50). The next step in the certification process requires a site visit to inspect the facility, verify insurance credentials, inspect tools, inspect the security measures for the stickers and inspect for necessary signage. (N.T. at 49; 51-52). After the certification has been finalized, Mr. Hawkins returns to the inspection station at a later date to be sure that the proper procedures are being followed. (N.T. at 52).

In 2013 with respect to the instant case, Mr. Hawkins became involved in the station certification process of Valley Auto, located in Philadelphia, beginning with a

4

phone call in mid-to-late winter. (N.T. at 51-52). Mr. Hawkins made an in-person visit to Valley Auto which he described as atypical in that it had only one bay, one man door, no lift and no parking in front as the garage emptied onto the sidewalk. (N.T. at 54-55). Upon inspection, he found that the garage bay area was smaller than the 12" X 22" area required by PennDOT regulations. (N.T. at 52; 53). Mr. Hawkins denied certification and explained to the owners that a wall had to be moved to permit him to certify the station. (N.T. at 52).

Mr. Hawkins could not remember the name of the individual who made the initial phone call, but he testified that he was the same person he that he had spoken with during the audit and who had a certificate to inspect vehicles. (N.T. at 51-52). Based on the signature on a copy of MV-427 that was admitted into evidence during the trial, Mr. Hawkins had been interacting with Mr. Edward Boykin. ("Mr. Boykin"). (N.T. at 61-62; Com. Exh. 3). The MV-427 is the inspection station license form that must be displayed on the wall in the shop. (Id.)

Mr. Hawkins returned 5-7 days later and the wall had been moved approximately 1 foot to comply with the minimum area requirement. (N.T. at 53). However, during the second visit to Valley Auto, he discovered that the garage was not equipped with a necessary jack to lift the cars for the undercarriage inspection as it was not equipped with a car lift; therefore, certification was denied a second time. (N.T. 57). Mr. Hawkins said that during the second inspection he met with the same individual along with Appellant. (N.T. at 58). He stated that Appellant had become involved in the process to ensure that all requirements of an inspection station were present at Valley Auto. (Id.)

The certification was again denied after a third in-person visit due to another missing tool. (N.T. at 58). Finally, after a fourth in-person visit, Mr. Hawkins found that the regulatory requirements were met and therefore, the qualification process had been completed. (N.T. at 59). Mr. Hawkins completed an audit report of his findings. (N.T. at 62). To complete the appointment process, Mr. Hawkins called PennDOT in Harrisburg with the information provided on the first page of MV-425. The MV-425 is a multiple page document which includes document MV-500 which must be completed as a signature card for those individuals in the business that are authorized to purchase inspection stickers. (N.T. at 63). On page 5 of the document, the owners of the company or corporation are listed along with their titles, dates of birth and driver's license numbers. (N.T. at 63-64). Mr. Boykin was listed as the owner and president on the application along with Appellant as vice president. (N.T. at 64). It also includes the federal tax Identification number, the state sales tax identification number, Mr. Boykin's name as an authorized inspection agent, the name of the emissions analyzer, the insurance coverage information and who will be ordering inspection stickers. (N.T. at 61-65; Com. Exh. 3). PennDOT then provides a station number. (N.T. at 64-65).

Mr. Hawkins later learned that a large sticker order had been placed by Valley Auto on June 21, 2013, when his supervisor requested him to audit Valley Auto based on the number of stickers purchased. (N.T. at 68). Mr. Hawkins testified that, based upon his work experience, the size of a service station enables him to estimate an average number of inspection stickers a station will need. (N.T. at 67). He specifically testified that the vehicle inspection regulations require a one hour minimum timeframe to conduct an inspection and fifteen minutes for an emissions inspection. To formulate

6

an estimate, he would compare these requirements to Valley Auto's single bay and single authorized technician. (Id.)

Mr. Hawkins went to Valley Auto's location on five days from June 24, 2013 – June 28, 2013, within one week of approving it as an inspection station, only to find it closed and locked. (N.T. at 68-69; 71-74). In addition to going to the garage, Mr. Hawkins made six or seven unsuccessful phone calls. (Id.)

Edward Boykin is a trained auto mechanic who, at the time, was licensed to perform vehicle safety and emissions inspections. (N.T. at 86-87). He had been working for Dixon Brothers Auto Exchange when he was approached by a man named Nathaniel who previously dated his sister, about opening an inspection station along with his cousin, Appellant, because he was already certified to perform vehicle inspections. (N.T. at 89). Mr. Boykin initially spoke only with Nathaniel and felt unsure about getting involved in the proposition. (N.T. at 89-90).

Nathaniel and Appellant approached Mr. Boykin again and he agreed to become involved. (N.T. at 90). Mr. Boykin described his involvement providing as assistance in obtaining the required tools for the shop. (N.T. at 90-92). Mr. Boykin testified that Nathaniel and Appellant had already secured a shop location and had gathered the paperwork to start the certification process. (N.T. at 91-92). The business account was opened in Mr. Boykin's name while Appellant was in charge of setting up the telephone service and getting any necessary paperwork. (N.T. at 93). Mr. Boykin stated that Nathaniel and Appellant funded the purchase of the tools even though he went along a few times when they were purchased. (N.T. at 93-94). Mr. Boykin testified that the three

7

men had been working on getting the garage running for about one month before the inspector made his first visit. (N.T. at 94). Mr. Boykin confirmed that the officer assigned to inspect the station for certification made three visits before the application was granted. (N.T. at 94-96). According to Mr. Boykin, Nathaniel and Appellant were present for all of the visits by the quality assurance officer. (Id.)

On the day that the quality assurance officer granted approval to Valley Auto, Mr. Boykin and Appellant signed the paper work as co-owners. (N.T. at 97). The three men travelled in a car driven by an unknown fourth male to PennDOT in Harrisburg to purchase the safety and emissions stickers. (N.T. at 97-98). On June 21, 2013, upon arrival at PennDOT, Boykin and Nathaniel had a discussion about the number of stickers the men wanted which was 10,000. Boykin said that the large amount requested made him feel "a little shaky" about the transaction. (N.T. at 97; 99; 105). He considered this amount to be unusually large based upon his experience with Dixon Brothers Auto Exchange as two mechanics performed auto inspections and only three or four hundred stickers were ordered every couple of months. (N.T. at 98). Nathaniel's only explanation was that he did not want to have to come back to PennDOT to get more. (N.T. at 97; 99). Mr. Boykin completed and signed the form necessary to process the sticker request at Nathaniel's and Appellant's direction and with their assistance. (N.T. at 100-101). Mr. Boykin stated that he completed the entire form but, Nathaniel and Appellant told him what amount to write. (N.T. at 102-103; Com. Exh. 5). The men eventually bought 4,000 safety inspection stickers. (N.T. at 105).

The PennDOT teller questioned the request for such a large number of stickers and encountered difficulty with the computer system when attempting to input a request

8

that large. (N.T. at 99). After Mr. Boykin went to the restroom to "clear his head," he returned to the counter where a second PennDOT employee was assisting with the purchase and was finally able to complete the transaction. (N.T. at 99-100; 105).

The men attempted to complete the necessary form occurred more than one time due to mistakes and multiple changes to the number of stickers as the computer system would not allow such a large amount to be processed. (N.T. at 102-104). The stickers were paid for with the last of four checks after three others were voided due to mistakes and changes to the order amount. The check had been filled out by Appellant and signed by Mr. Boykin. (N.T. at 100; 106; 126-127; 135-136). When Boykin questioned whether the account contained funds to cover the check as he had not remembered any deposits after the initial $50 to start the account, Nathaniel assured him that $12,000 was in the account. (N.T. at 100; 106; 131).

Mr. Boykin carried the sheets of inspection stickers and the men travelled by car back to Philadelphia. (N.T. at 111-112). Mr. Boykin was driven back to his own car where he left the inspection stickers in the possession of Appellant and Nathaniel. (N.T. at 111-112; 131-132). Over the next few months, Mr. Boykin was unable to reach Nathaniel so he called Appellant to have him contact Nathaniel. (Id.) After Boykin made several more phone calls to Appellant, he stopped answering his calls, too. (N.T. at 112). When Mr. Boykin tried to call Valley Auto, no one ever answered. (Id.) Mr. Boykin testified that he never did any inspections for Valley Auto, never saw the stickers again and never saw Nathaniel or Appellant in connection with the business. (N.T. at 112-113). Later, Mr. Boykin saw Appellant prior to trial when Appellant appeared at the

9

Dixon Brothers Garage to ask him to write a letter stating had not done anything incriminating. (N.T. at 113-114).

Mr. Thomas Wagner ("Mr. Wagner") has been working at PennDOT for seventeen years and is currently assigned to the dealers counter. (N.T. at 140-142). His responsibilities include the issuance of safety and emissions inspection stickers to inspection stations that range in size from small family-owned shops to large car dealerships and rental car fleets. (N.T. at 141-145). If a station has been newly authorized to conduct vehicle inspections, he will receive a message about the approval and that a representative will be coming in for stickers. (N.T. at 143-144). He supplies the PennDOT form to be completed and provides any necessary customer assistance. (Id.) In his experience, the range of sticker amounts for small to medium garage is 10-300 stickers. (N.T. at 146-147).

On June 21, 2013, Mr. Wagner received notification that a new customer, Edward Boykin, would be coming to his counter to purchase inspection stickers. (N.T. at 148; 153). Mr. Boykin, Appellant and two other people came to his counter and needed instruction on completing the paperwork to obtain inspection stickers which is MV-Form 436A. (N.T. at 148; 150-151; 154). As Mr. Wagner explained the process and Mr. Boykin completed MV-Form 436A, Appellant and Mr. Boykin were conferring with him about the form. (N.T. at 153-154). Mr. Wagner recognized one of the men as a Mr. Shoatz, a man with whom he had had prior dealings. (N.T. at 150; 153). The men requested 7,000 inspection stickers which Mr. Wagner described as "an uncharacteristic amount" and about which he was concerned. (N.T. at 153-154; 162-163). Because his

10

work shift was ending, Mr. Wagner handed over the transaction to another employee, Mr. Leonard Bittinger ("Mr. Bittinger"). (N.T. at 160-164).

Mr. Bittinger has been employed by PennDOT in various capacities, including with the Inspection Unit, for twenty-two (22) years. (N.T. at 169-170). He took over the transaction at issue when Mr. Wagner's shift ended. While apprising himself of the details of the transaction, he encountered three men working on the form and a request for an unusually large number of inspection stickers in relation to the size of the shop and newness of the business. (N.T. at 171-172; 176-177). Mr. Bittinger was haggling with the men, including Appellant, over the number of inspections stickers Valley Auto would need. (N.T. at 172-173; 176-177). In Mr. Bittinger's experience, this type of haggling over the amount of stickers was uncommon. (N.T. at 177). The men told Mr. Bittinger that they had 12 service bays and were working on signing a fleet account so a large amount of inspection stickers would be needed. (N.T. at 173).

Mr. Bittinger stated he remembers that they requested over 5,000 stickers because the computer system prohibited him from issuing any more than that amount and he had not encountered a limit before. (N.T. at 173-174). He explained that the situation he faced with Appellant and his associates was so unusual that he consulted with another Inspections Unit employee, Catherine Barnhill ("Ms. Barnhill"), regarding the propriety of such a large sale and to verify that there was enough sticker inventory to meet the request. (N.T. at 180-181). The parties finally settled on 4,000 safety inspection stickers for a total of $8,000[7] and 5000 emissions inspection sticker because

_____

[7] The safety inspection stickers come in sheets of 10 at a cost of $2 per sticker. (N.T. at 185; 193). The emissions inspection stickers are free of charge.

11

this was the amount the computer system would allow to be processed. (N.T. at 173-174; 177; 181-182; 196). Mr. Bittinger and Ms. Barnhill had to work together negotiating the amount of stickers to arrive at an amount that the computer system would accept. (N.T. at 193-194).

Mr. Bittinger accepted a check from Appellant in payment for the stickers. (N.T. at 182-184). He explained that more than one check was written and form completed because of mistakes made and the ongoing changes in the amount of the order. (N.T. at 182-184). Mr. Bittinger testified that he saw Appellant sign the final check submitted for payment. (N.T. at 182-183). Ms. Barnhill stated that the "younger" gentleman filled out the form but, did not talk much as Appellant wrote the check and explained how much business they were going to have. (N.T. at 195). In Mr. Bittinger identified Appellant as the individual who wrote the check in the group who bought the stickers. (N.T. at 186-187). He also identified the check and the inspection sticker order form. (Id.) Mr. Bittinger testified that all the men left PennDOT together. (N.T. at 186).

The unusual nature of the large request for inspection stickers was echoed by Ms. Barnhill. She testified that since the men were starting a new business, in her experience, you have no way of knowing how much inspection business you will have; therefore, you do not know when the amount of money paid for a large amount of stickers will be recouped. (N.T. at 194). When Mr. Bittinger brought up this subject, he recalls Appellant responding that they would receive a profit to cover the expense or that money was no object. (N.T. at 178). However, the men gave Ms. Barnhill a different story regarding the source of their business. Appellant told her that Valley Auto

12

was replacing an inspection station and the residents were anxiously awaiting their opening. (N.T. at 194).

PennDOT initiated the investigation after the check presented by Appellant and his associates was dishonored and officials noted the unusually large quantity of stickers had been purchased. (N.T. at 211-212). The circumstances prompted PennDOT to send a quality assurance officer to investigate Valley Auto who reported that the garage was closed. (Id.) PennDOT officials detailed the incident in a letter and informational packet, which included the quality assurance officer's follow up report, forwarded to the Pennsylvania State Police ("PSP"). (N.T. at 209; 214). As a result, PennDOT requested that the PSP enter the sticker numbers be entered into the CLEAN-NCIC database to determine if any had been reported as being recovered. (N.T. at 212).

Trooper Chad Berstler ("Trooper Berstler") of the PSP Fraud Investigations Unit became involved in this case at the request of PennDOT. (N.T. at 205; 209). Trooper Berstler's duties include the investigation of fraud or misuse relating to safety and emissions inspection stickers. (N.T. at 206).

Trooper Berstler testified that Appellant had been identified by officials at PennDOT from a video recording of the sticker purchase transaction and a comparison of the names provided with the documentation submitted from the Valley Auto inspection station. (N.T. at 210-211). Trooper Berstler identified the individuals depicted in the PennDOT video as Appellant, Edward Boykin and Nathaniel Shoatz. (N.T. at 211).

13

During his testimony, Mr. Bittinger had explained that each sticker has a serial number that corresponds to the then sticker she from which it was taken. (N.T. at 185). The PennDOT computer system also tracks the entire lot given to a particular customer by serial number. (Id.) Trooper Berstler testified that four inspection stickers from the lot purchased by Appellant and his associates had been recovered at the time of trial. (N.T. at 213).

## DISCUSSION

Appellant's first assertion of error claims that this Court refused to instruct the jury regarding the presumption found in the "Bad Checks" statute found at 18 Pa.C.S. § 4105(b). This Court provided the following instruction to the jury:

> The Defendant has been charged with issuing a bad check in the amount of $8,000. To find the Defendant guilty of this offense, you must find that each of the following elements has been proven beyond a reasonable doubt: First, that the Defendant issued or passed a check in that amount; and, second, that the Defendant knew that the check would not be honored by the drawee and the drawee – by the drawee bank because of insufficient funds. And, third, you would also have to find the amount of the check, and there's a space on the verdict slip and you would have to indicate whether the amount of the check was over a certain dollar amount. I think it's a thousand dollars. Yeah, $1,000. (N.T. at 236).

Appellant placed an exception on the record claiming that the "presumption" in section 4105(B)[8] of the statute "should have been read as an element of the crime"

---

[8] 18 Pa.C.S. § 4105(B):

  **(b) Presumptions.**--For the purposes of this section as well as in any prosecution for theft committed by means of a bad check, the following shall apply:
    (1) An issuer is presumed to know that the check or order (other than a post-dated check or order) would not be paid, if:
        (i) payment was refused because the issuer had no such account with the drawee at the time the check or order was issued; or

14

when this Court instructed the jury on the law. (N.T. at 250). In support of his position, Appellant relies upon Commonwealth v. Griffith,[9] for the proposition that the Court in that case defined the "bad checks" charge with the presumption language, thereby requiring the prosecution to prove in this case that Appellant had received notice of the check bouncing and did not make good on the check within 10 days. (N.T. at 250). Appellant contends that pursuant to Griffith, the notice provision in the presumption language should be strictly construed as requiring proof of such notice to sustain a conviction; therefore, this Court erred in failing to instruct the jury of the presumption. (N.T. at 250-251).

Upon review of the "bad checks" jury charge given at trial, this Court finds that it appropriately instructed the jury on the law. When reviewing a challenge to a part of a jury instruction, the Court must review the jury charge as a whole to determine if it is fair and complete. A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate

---

(ii) payment was refused by the drawee for lack of funds, upon presentation within 30 days after issue, and the issuer failed to make good within ten days after receiving notice of that refusal.

Notice of refusal may be given to the issuer orally or in writing by any person. Proof that notice was sent by registered or certified mail, regardless of whether a receipt was requested or returned, to the address printed on the check or, if none, then to the issuer's last known address, shall raise a presumption that the notice was received.

(2) A check or order stamped "NSF" or "insufficient funds" shall raise a presumption that payment was refused by the drawee for lack of funds.

(3) A check or order stamped "account closed" or "no such account" or "counterfeit" shall raise a presumption that payment was refused by the drawee because the issuer had no such account with the drawee at the time the check or order was issued.

[9] 364 A.2d 374 (Pa.Super. 1976).

15

statement of the law is there reversible error. Commonwealth v. Jones, 542 Pa. 464, 668 A.2d 491(1995)(Internal citations omitted).

Caselaw interpreting Section 4105 makes clear that the Commonwealth must establish that an individual issued a check knowing that there were insufficient funds in his or her account to cover it. (18 Pa.C.S. §4105(a)(1); Commonwealth v. Burruss, 380 Pa.Super. 272, 551 A.2d 580 (1988)). The statute also permits a jury to presume that the drawer of the check had knowledge that the check would be dishonored if, after receiving notice of dishonor from the financial institution, within 10 days he has not made good by depositing funds into the account. Commonwealth v. Burruss, 551 A.2d 580, 584, fn.4. However, the statutory presumption is not the only way by which the Commonwealth can prove intent on the part of the drawer as it also may be proven by direct evidence. Commonwealth v. Griffith, 242 Pa. Super. 484, 487-488, 364 A.2d 374, 376; Commonwealth v. Chase, 413 Pa. Super. 594, 598 605 A.2d 1276, 1278 (1992).

In the instant case the Court clearly and adequately instructed the jury as to these specific statutory elements. The jury instruction given by this Court tracks the statutory language. When defense counsel lodged his objection to this Court's denial of his request to instruct on the presumption in section 4105(b), he argued that the "presumption under subsection B of the bad checks charge should have been read as an element of the crime...." (N.T. at 250). However, at the conclusion of the jury charge this Court asked counsel if any additional instructions were necessary and both attorneys responded in the negative. (N.T. at 239-240). Additionally, upon review of the statutory language and applicable caselaw, this Court finds that intent may also be proven by direct evidence.

16

As the Commonwealth presented direct evidence of intent by witness testimony in connection with the security video showing the presentation of the dishonored check, it did not rely on the presumption to prove intent in this case. As such, this Court clearly and adequately instructed the jury on this charge; therefore, Appellant's claim is without merit.

Appellant's next claim on appeal is that this Court erred in permitting the Commonwealth to amend the criminal information prior to trial. Pennsylvania Rule of Criminal Procedure 564 provides that "[t]he court may allow an information to be amended when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice." When interpreting Rule 564, the Superior Court has found that the underlying "purpose of Rule 564 is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." Commonwealth v. Sinclair, 897 A.2d 1218, 1221 (Pa. Super. 2006) citing Commonwealth v. Duda, 831 A.2d 728, 732 (Pa.Super.2003). The Superior Court in Sinclair went on to announce that the test to be applied is:

> [W]hether the crimes specified in the original indictment or information
> involve the same basic elements and evolved out of the same factual
> situation as the crimes specified in the amended indictment or information.
> If so, then the defendant is deemed to have been placed on notice
> regarding his alleged criminal conduct. If, however, the amended provision
> alleges a different set of events, or the elements or defenses to the
> amended crime are materially different from the elements or defenses to

17

the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted. Id. *quoting* Commonwealth v. Davalos, 779 A.2d 1190, 1194 (Pa.Super. 2001) (citation omitted).

In the instant matter, on the day of trial prior to jury selection, the Commonwealth made an oral motion to amend the criminal information to consolidate the three separate conspiracy charges connected to the three underlying crimes charged - deceptive business practices, theft by deception and bad checks - into one count connected with all three of them. (N.T. at 1). Additionally, the Commonwealth requested permission to add another name to Edward Boykin's name as co-conspirator, specifically, Nathaniel Shoatz. (N.T. at 1-2). This Court entertained argument on the Motion which resulted in the amendment of the criminal information by withdrawing two conspiracy charges at counts 4 and 6; the addition of theft by deception and/or bad checks to the crimes underlying the conspiracy charge at count 2; and, adding "other unknown male" to Edward Boykin as co-conspirator at count 2. (N.T. at 6).

Appellant argues that the amendment which added another possible coconspirator was prejudicial to him as the amendment took place shortly before picking a jury and amounted to a new conspiracy charge for which he unprepared to defend. (N.T. at 2). The Commonwealth countered this position by asserting that on the criminal complaint form a box indicating that conspiracy is being charged in conjunction with each primary offense put Appellant on notice. (N.T. at 3-4). The Commonwealth further argued that in light of the fact that Appellant and his counsel had viewed the surveillance video from the PennDOT counter showing three men working together to complete the transaction, the addition of "other unknown male" would not prejudice the Appellant in mounting his defense. (N.T. at 2-3; 5-6).

18

Upon consideration of the arguments, this Court granted the Commonwealth's request to add to the conspiracy "other unknown male" in addition to Mr. Boykin's name as a possible co-conspirator. (N.T. at 6). The Commonwealth proffered that it would be presenting evidence in the form of a video showing Appellant, Mr. Boykin and another male working together towards the purchase of the inspection stickers. Appellant was already on notice by way of the criminal complaint that he would have to defend against conspiracy allegations in connection with the fraudulent business practices, theft by deception and bad checks charges as a general proposition; therefore, the addition of a nondescript co-conspirator to the criminal information would not require him to answer to or defend against any new criminal elements than those already charged. Further, the crimes with which he was charged arose out of one set of facts involving all three men. In other words, as Appellant had already seen the video footage showing him interacting with two other men, one of which was Mr. Boykin, whether the alleged co-conspirator in each crime was Mr. Boykin or the yet to be identified and arrested unknown man is of no moment with respect to preparing a defense. Therefore, this Court finds that Appellant's claim must fail as no new crime was charged by amending the criminal information and Appellant suffered no prejudice.

The next two issues raised by Appellant challenge this Court's rulings on the admissibility of evidence. First, he claims that this Court erred when it admitted a copy of the Valley Auto, Inc. check used to purchase inspection stickers without proper authentication of the document. The Pennsylvania appellate courts have made clear that:

19

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. The requirement of authentication or identification is codified at Pennsylvania Rule of Evidence 901, 42 Pa.C.S.A.: "(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pa. R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence. Pa. R.E. 901(b)(1). Abuse of discretion is shown in the record where the court does not apply the law in reaching judgment, or exercises manifestly unreasonable judgment, or judgment that is the result of partiality, prejudice, bias, or ill will. Commonwealth v. Mitchell, 883 A.2d 1096, 1109-1110 (Pa. Super. 2005)(internal citations omitted).

Appellant is not specific as to what aspect of the authentication was lacking when this Court admitted the copy of the check. However, a document may be authenticated by direct proof and/or by circumstantial evidence. In re: F.P., 878 A.2d 91, 94 (Pa. Super. 2005). "[P]roof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." Id. citing Commonwealth v. Brooks, 352 Pa.Super. 394, 508 A.2d 316, 318 (1986) quoting McCormick, Evidence § 222 (E. Cleary 2d Ed.1972). "The courts of this Commonwealth have demonstrated the wide variety of types of circumstantial evidence that will enable a proponent to authenticate a writing." Id. (collecting cases). Applying these principles, this Court finds that sufficient evidence was presented by the Commonwealth to authenticate the copy of the check and permit its admission into evidence.

Mr. Boykin testified to several supporting facts which taken as a whole served to authenticate the check. He recognized the check as one of the "starter" checks issued by Wells Fargo Bank when all three men went to the bank to open the account for Valley Auto. (N.T. at 135-136). The copy of the check listed Valley Auto as the account holder and was made out to PennDOT for the amount of $8,000, the specific cost of the

20

safety inspection stickers. (N.T. at 135; 196). Mr. Boykin's testimony is that of a witness with personal knowledge "that a matter is what it is claimed to be...." (Pa.R.E. 901(b)(1)). This Court did not err as the copy of the check admitted into evidence was sufficiently authenticated.

Appellant next claims that this Court erred by admitting the testimony regarding the "quantity of inspection stickers sold in a single transaction" as it was irrelevant and the prejudicial nature of the evidence outweighed the probative value. We disagree.

As previously stated, this Court's ruling on the admissibility of evidence will only be reversed if upon review the appellate court finds an abuse of discretion. Commonwealth v. Mitchell, *supra*. Although the Appellant does not specify which witness's testimony he is challenging, a review of the record reveals that objections were lodged in connection with the testimony of Mr. Hawkins and Mr. Wagner regarding their personal experience during their employment with PennDOT working with the vehicle inspection program. (N.T. at 66; 162). Notably, Appellant did not object when Mr. Bittinger and Ms. Barnhill testified regarding unusual nature of the large quantity of stickers. (N.T. at 172-178; 194).

First, we will address Appellant's claim that the challenged testimony should have been excluded as irrelevant. A review of the objections lodged by counsel to the specific testimony at issue reveals that the basis proffered for the objection to Mr. Hawkins' testimony did not include relevancy. Therefore, this Court finds that Appellant has waived his challenge with regard to the relevancy of the testimony admitted. "Where the objection challenges a specific evidentiary matter, all other grounds for excluding

21

the evidence are waived." Commonwealth v. Berry, 355 Pa. Super. 243, 256, 513 A.2d

410, 416 (1986) *citing* Commonwealth v. Williams, 476 Pa. 557, 383 A.2d 503 (1978).

With respect to Mr. Hawkins' testimony, Appellant's counsel objected to Hawkins

rendering an estimate as to the ordinary amount of inspection stickers a shop the size of

Valley Auto would need to conduct business. (N.T. at 65-67). The basis of Appellant's

objection was that Mr. Hawkins was not qualified as an expert to render such an

opinion. (N.T. at 66). However, it was unnecessary for Mr. Hawkins to be qualified as

an expert to provide his opinion as he was drawing from knowledge gained through

work experience, not the type of scientific, specialized or technical knowledge

contemplated by Pa.R.E. 702 "Testimony by Experts."

Pa.R.E. 701 "Opinion Testimony by Lay Witnesses" provides:

If a witness is not testifying as an expert, testimony in the form of an
opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to
determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within
the scope of Rule 702.

Mr. Hawkins testified to the method by which he estimates the amount of

business a particular shop will have and thus, the estimated amount of inspection

stickers necessary to keep up with the amount of business. (N.T. at 67). Notably,

despite the fact that Appellant is challenging the admissibility of the testimony regarding

the "quantity of inspection stickers sold in a single transaction," Mr. Hawkins did not

testify to his opinion on the quantity requested by Appellant and his associates or what

22

he deemed to be unusual; rather, he testified that the reason given by his supervisor as to why PennDOT had requested an in-person visit to Valley Auto was the large number of stickers obtained in Harrisburg. (N.T. at 67-68). Accordingly, his testimony was not about the size of the sticker order at all. More importantly though, Mr. Hawkins' testimony falls squarely under Rule 701, as his estimates are based upon PennDOT regulations that govern all aspects of vehicle safety inspections including the time that must be spent on each vehicle safety inspection, which is at least one hour in addition to fifteen minutes for an emissions inspection. (N.T. at 67). He explained that, to formulate an estimate, he would compare the regulatory requirements to the size of the auto shop and the number of mechanics licensed to perform inspections, in this case one. (Id.) Mr. Hawkins' testimony was clearly based on his personal perception of the operations of Valley Auto and the specific facts observed by him and relayed by his employment supervisor. This Court properly exercised its discretion in admitting Mr. Hawkins' testimony on this subject. In addition, applying the rule in Berry, as set forth above, and given the specific grounds on which the objection was made, we find that Appellant has waived his claim that Mr. Hawkins' testimony was more prejudicial than probative.

This Court also finds that no abuse of discretion occurred with regard to Mr. Wagner's testimony about the large number of inspection stickers involved in the transaction. Review of the transcript indicates that Appellant's counsel provided no specific basis for his initial objection to Mr. Wagner's testimony regarding the inspection sticker quantity requested in the transaction he handled. (N.T. at 162). Later, upon redirect examination, Appellant objected to Mr. Wagner's testimony that he had never

23

had a customer request 7,000 stickers prior to the transaction with Appellant. (N.T. at 166). At this point in his testimony, Appellant's counsel objected on the basis of relevance. (N.T. at 167). Therefore, this Court finds that with respect to Mr. Wagner he has preserved the relevance issue for appeal.

Pennsylvania Rule of Evidence 401 reads as follows:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

The Pennsylvania Supreme Court has interpreted Rule 401 to mean: Evidence is considered relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. Commonwealth v. LaCava, 542 Pa. 160, 174, 666 A.2d 221, 227-28 (1995). "Evidence that merely *advances an inference* of a material fact may be admissible, even where the inference to be drawn stems only from human experience" Commonwealth v. Hawk, 551 Pa. 71, 77, 709 A.2d 373, 376 (1998)(emphasis in original).

For each of the charges in this matter the Commonwealth was required to prove the fact that Appellant used some form of deception, misleading statements or false impression to achieve the end result of obtaining safety and emissions inspection stickers for improper use. Upon consideration of the context of Mr. Wagner's testimony on the subject, it is clear that the purpose was to give an estimate of the amount based on his employment experience of the average amount of stickers usually purchased by

24

a shop of comparable size, specifically 10-300. Mr. Wagner provided his opinion that Appellant's request of 7,000 stickers was unusual and the first time he had encountered such a request. (N.T. at 147; 162-163; 166-167).

When Appellant was questioned about the unusual nature of his large request, he gave different stories to Mr. Bittinger and Ms. Barnhill regarding the reason why Valley Auto needed so many stickers. (N.T. at 178; 194). Viewing Mr. Wagner's testimony in the context of the ever changing stories given to explain why such a large quantity of stickers was needed in light of the criminal elements the Commonwealth was required to prove, Mr. Wagner's testimony about the highly unusual nature of the transaction based on his years of experience advanced the inference that Appellant's representation to PennDOT were false impressions or outright misleading. The evidence is clearly relevant to the jury's determination of the false nature of Appellant's representations during the transaction. Therefore, this Court properly admitted the challenged testimony.

This Court was also required to determine whether relevant evidence is more probative than prejudicial. Appellant argues that the challenged testimony is more prejudicial than probative, but does not point out in what way it is prejudicial. Once evidence is determined to be relevant, it may be admitted into the record unless otherwise excluded by statute or rule of law. (Pa.R.E. 402).[10] In addition, "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury,

---

[10] All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. (Pa.R.E. 402).

25

undue delay, wasting time, or needlessly presenting cumulative evidence." (Pa.R.E. 403).

As explained by the Superior Court, "The comment to Pa.R.E. 403 instructs that: 'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. However, evidence will not be prohibited merely because it is harmful to the defendant. Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." Commonwealth v. Antidormi, 2014 PA Super 10, 84 A.3d 736, 750 *appeal denied,* 95 A.3d 275 (Pa. 2014)(internal citations and quotation marks omitted).

As stated above, review of the record reveals that Appellant's counsel merely cited relevance as his basis for the objection to Mr. Wagner's testimony and did not argue to this Court why the evidence was more prejudicial than probative. Nonetheless, upon application of the legal standards set forth in Pa.R.E. 403, this Court fails to see how Mr. Wagner's testimony which was based on his long time work experience created "unfair prejudice" in any way. There was nothing confusing or inflammatory about Mr. Wagner relaying his professional experience to the jury; rather, it provided a fact upon which the jury could make a comparison and credibility determination when deliberating on the reasons given by Appellant as to why such a large amount of stickers were necessary for Valley Auto.

Next, the Appellant claims that the Commonwealth failed to present sufficient evidence at trial to prove that he did the following: made a false, misleading, or material

26

statement; agreed with the co-defendant(s) to engage in conduct which constitutes a crime or an attempt or solicitation to commit a crime; intended to commit conspiracy; received property or intended to receive property by deception; or, knew the check would not be honored. However, Appellant also challenges the jury's verdict contending that it was against the weight of the evidence to such an extent so as to shock one's sense of justice. Accordingly, this Court must analyze the weight of the evidence issue first as it is well established that "when a defendant motions for a new trial based on a weight of the evidence claim, he concedes that sufficient evidence exists to sustain the jury's verdict." Commonwealth v. Rosetti, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004).

Appellant argues that the verdict is against the weight of the evidence because the Commonwealth never showed that: Appellant was associated with the business in question, agreed with the co-defendant(s) to engage in the conduct which constitutes a crime or an attempt or solicitation to commit a crime; intended to commit conspiracy; or, any false or misleading statement was put forth regarding the business or obtaining the emission/inspection stickers. With respect to a weight of the evidence challenge, our Supreme Court has stated that:

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The fact finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

27

Commonwealth v. Weathers, 95 A.3d 908 (Pa. Super. 2014) *citing* Commonwealth v. Diggs, 597 Pa. 28, 949 A.2d 873, 879–80 (Pa.2008) (internal citations omitted).

Relying upon Rosetti, *supra.*, this Court finds that by making a weight of the evidence argument with respect to agreeing with co-defendant(s) to engage in conduct which constitutes a crime or an attempt or a solicitation to commit a crime; the intent to commit a conspiracy; and, providing false or misleading statements regarding the business or obtaining the emissions/inspection stickers, he concedes that sufficient evidence was presented at trial to sustain the jury's verdict. Therefore, this Court finds that the evidence with respect to these trial issues was sufficient and it is unnecessary to address those issues in this opinion.

Turning to the weight of the evidence analysis, it is not clear to which particular charge Appellant is attributing his argument. From what we can discern, it appears that Appellant is generally contending that the weight of the evidence presented by the Commonwealth is so meager that it did not connect him to any agreement with the three individuals who used Valley Auto as a sham to give a false impression to PennDOT that they were starting an inspection station to obtain vehicle safety and emissions inspection stickers for their own improper use. A review of the record reveals ample evidence from which the jury could infer action on the part of Appellant to support the verdicts rendered.

Regarding Appellant's connection with the business, a review of Mr. Boykin's testimony as a whole makes clear that he was involved in each step of the process of establishing Valley Auto as a licensed certified inspection station whether taking his own

28

individual action or acting along with Mr. Boykin and the third man identified as Nathaniel. Appellant took the following steps in the certification process which directly link him with the business: approached Boykin along with Nate to propose starting the business; went along with Boykin to set up a business account; sought out and purchased the necessary tools to comply with PennDOT program regulations; obtained and completed the application for certification; had his name on the certification as the Vice President of Valley Auto; participated in the completion of the PennDOT paperwork and check writing to purchase the stickers; and, took possession of the stickers upon their return to Philadelphia. (N.T. at 90-98; 120-127; 131-132).

Mr. Hawkins' testimony also supports the jury's finding of Appellant's association with the business. According to Mr. Hawkins, Appellant was part of each on-site review in the certification process, was on the PennDOT documents as the Vice President of Valley Auto, and his conversations were split 50/50 between Boykin and Appellant. (N.T. at 58; 64; 76). Finally, Mr. Boykin, Mr. Wagner, Mr. Bittinger and Ms. Barnhill all identified Appellant as an individual in the security video participating in the purchasing of vehicle inspection stickers on behalf of Valley Auto. (N.T. at 107-108; 111; 152-160; 175-182). Given that the evidence established Appellant's uninterrupted participation in the scheme that culminated in the purchase of inspection stickers for a sham business, the jury's guilty verdict that he intended to commit a crime and was involved in the solicitation of Boykin into the conspiracy does not shock one's sense of justice.

In addition, the evidence clearly established that Appellant actions and words amounted to several false statements and misrepresentations. Appellant filled out the order form at PennDOT on which he represented that Valley Auto was a legitimate

29

business entity created for the purpose of performing vehicle safety inspections. At trial it was established that Appellant filled out paperwork to have the garage certified and met with Mr. Hawkins during the certification process. (N.T. at 57-59). He also filled out the check at PennDOT which Boykin signed to finalize the purchase. (N.T. at 182-184). Mr. Bittinger and Ms. Barnhill testified to the stories Appellant gave him in response to his inquiry as to why they needed such a large amount of stickers. (N.T. at 194-195). First he said that the business would be servicing a fleet of rental cars, then he said that the neighborhood residents were awaiting the reopening of Valley Auto so a group of customers had already been formed. Finally, Testimony of Mr. Boykin, Mr. Hawkins and Trooper Berstler established that no vehicle inspections were ever conducted at Valley Auto and, further, inspection stickers from the lot purchased by Appellant and his associates were recovered after the serial numbers were entered into CLEAN-NCIC. (N.T. at 68-69; 71-74; 112-113; 213). Again, based on a review of the evidence presented by the Commonwealth, this Court finds that the jury's finding that Appellant presented false statements and/or misrepresentations to obtain the inspection stickers improperly for an unlawful use does not shock one's sense of justice.

The remaining sufficiency claim pertains to whether the Commonwealth proved that Appellant knew the check passed to PennDOT would not be honored. The Superior Court has stated that the standard of review when an appellant is challenging the sufficiency of the evidence is well established:

> "...whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and

30

circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

\*\*\*\*\*\*

This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." Commonwealth v. Antidormi, 2014 PA Super 10, 84 A.3d 736, 756 (Pa. Super. 2014)(internal citations and quotation marks omitted).

To prove the offense of bad checks, the Commonwealth must show that a defendant. "...issue[d] or passe[d] a check or similar sight order for the payment of money, knowing that it will not be honored by the drawee." 18 Pa.C.S. §4107(a). Viewing the evidence of record in light of the verdict winner, specifically the Commonwealth, the totality of the circumstantial evidence supports the guilty verdict on the bad checks charge. Mr. Boykin testified that the business account had been opened with only $50 which he had deposited. Appellant filled out and presented the check signed by Boykin who made clear that he was being directed throughout the entire purchase process including the amount of stickers ordered. The security video clearly supports this testimony. It is undisputed that the check was dishonored. (N.T. at 211-212). In addition, as the evidence of presented dispelled any notion that Valley Auto was ever going to be a viable, legitimate business, it defies logic to argue that

31

Appellant thought there was $8,000 in an account for a non-existent business when the check was presented to PennDOT.

Finally, Appellant challenges the fine imposed by this Court as he contends it is excessive and unreasonable. With respect to the propriety of a fine our courts have found that:

> "Excessive bail shall not be required nor excessive fines imposed, nor cruel punishments be inflicted"; see *Commonwealth v. Strunk,* 400 Pa.Super. 25, 582 A.2d 1326 (1990) (" 'A punishment is considered "excessive" and therefore unconstitutional if it ... (2) is grossly out of proportion to the severity of the crime.' " *Id.* at 36, 582 A.2d at 1331, quoting *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)). " Com. v. Heggenstaller, 699 A.2d 767, 769 (Pa. Super. Ct. 1997).

Additionally, "[T]he primary purpose of a fine or a penalty is twofold[:] to punish violators and to deter future or continued violations. Since it serves not only as a punishment but also as a deterrent, the amount of the fine can be raised to whatever sum is necessary to discourage future or continued violations, subject, of course, to any restriction imposed on the amount of the fine by the enabling statute or the Constitution." Com. v. Eisenberg, 98 A.3d 1268, 1283 (Pa. 2014).

In the instant matter, Appellant was convicted of four third degree felonies. Pursuant to statute, the maximum fine which may be imposed for a single third degree felony is $15,000. The aggregate amount of fines imposed in this matter is $7,800 for *four* third degree felonies, an amount equal to a little over one-half of the possible fine for *one count*. (N.T., Sentencing, 10/17/14 at 8)(emphasis added). Additional important factors considered by this Court included the $8,000 check issued to PennDOT that bounced for which Mr. Boykin paid restitution; Appellant's history of convictions for

32

financially fraudulent activity including his prior record score of 5 and the fact that he was on federal probation at the time of sentencing; and finally, the considerable public safety concern raised by the fact that vehicle inspection stickers were disseminated to the public for vehicles that were likely hazards on the road. (N.T., Sentencing at 3-8). In view of the circumstances of Appellant's crimes and the other factors a sentencing Court may and should consider in fashioning a sentence, the $7,800 fine is far from excessive and hopefully will serve the purpose of deterring similar behavior in the future as intended by the law.

RICHARD A. LEWIS, PRES. JUDGE

MEMORANDUM DATE: April 29, 2015

DISTRIBUTION: 4-30-15 @ 11³⁰AM
Abby N. Trovinger, Esq., Deputy District Atty., Dauph. Co.  10
Jonathan R. White, Esq., Asst. Public Defender, Dauph. Co.  10
Clerk of Courts  KC
Superior Court Prothonotary  Mai 1
Court Admin. – Crim.  10
FILE – Judge Lewis  10

33